

ORDERED UNSEALED on 10/30/2023    s/ dominicfra
s/ dominicfrank

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>PING GAO,<br>    aka Jenny Gao,<br>    aka Gao Ping,<br><br>    Defendant. | Case No. '23 MJ3879<br><br>COMPLAINT<br><br>18 U.S.C. § 1343 – Wire Fraud;<br>18 U.S.C. § 1956(a)(1)(B)(i) – Concealment Money Laundering; 18 U.S.C. § 1957 – Money Laundering; 18 U.S.C. § 1028A and 18 U.S.C. § 2 – Aggravated Identity Theft; 18 U.S.C. §§ 981(a)(1)(C) and 982, and 28 U.S.C. § 2461(c) – Criminal Forfeiture<br><br>**[UNDER SEAL]** |

The undersigned complainant, being duly sworn, states as follows:

**Counts 1-2 – Wire Fraud**

(18 U.S.C. § 1343)

1. Beginning on a date unknown but no later than May 9, 2022, and continuing until at least April 21, 2023, in the Southern District of California and elsewhere, Defendant PING GAO knowingly and with the intent to defraud, devised and participated in a scheme and artifice to defraud and to obtain money and property from W.L. and his companies, Nautical Hero Group, LLC ("Nautical"), Axiom United Holdings, LLC ("Axiom"), and Vitality International Management, LLC ("Vitality") (collectively, the "Companies"), by means of materially false and fraudulent pretenses, representations, promises, and omissions.

2. It was part of the scheme and artifice to defraud that beginning on May 9, 2022, Defendant, who was a part time employee with

the Companies with signatory authority for and access to the Companies' bank accounts, secretly took sole control of the Companies' bank accounts and transferred over $23,000,000 of the Companies' funds to new bank accounts she opened and had access to and control over.

3. It was part of the scheme and artifice to defraud that due to her speed and deception in transferring the funds, Defendant was able to assume control of approximately $8,500,000 in funds that were not immediately frozen by a temporary restraining order ("TRO") entered by a San Diego Superior Court on May 24, 2022.

4. It was part of the scheme and artifice to defraud that in violation of the TRO and subsequent Injunction, Defendant spent millions of dollars of those funds to benefit herself and others in a way that did not remotely benefit the Companies. This includes transferring more than $1,000,000 to herself, spending tens of thousands of dollars or more on luxuries and at high-end fashion stores, buying a $160,000 Porsche, and wiring $1,600,000 to a bank account in Hong Kong, China. Further, prior to entry of the TRO, Defendant transferred $3,380,000 to her personal business and bought a $2,875,000 luxury home in San Diego, California and took residence there. None of the transfers, payments, and purchases were authorized by the Companies.

5. It was further part of the scheme and artifice to defraud that in an attempt to force the Companies and their owner, W.L., to dismiss their ensuing lawsuit and to oppose their motion for an Injunction in San Diego Superior Court, Defendant knowingly filed fabricated evidence regarding W.L.'s identity to support her defense that W.L. was an imposter and she was authorized by the real W.L. to preserve his assets. The fabricated evidence – a letter purportedly

from an attorney in China on behalf of W.L. and a notarized engagement agreement – did not bear W.L.'s true signature or an accurate Chinese identity card number for a male like W.L.  Further, the specified notary office in China that purportedly attested to W.L.'s signature issued a certified letter verifying that the notarial certificate did not come from its office.  Defendant committed such acts to further perpetuate the previously described scheme and artifice to defraud.

6.   It was part of the scheme and artifice to defraud that the principal goals were to embezzle funds from the Companies to enrich herself and others and to pay for her personal expenses.  It was also a goal of the scheme and artifice to defraud to conceal the source, location, ownership, and control of the misappropriated funds.

7.   It was a manner and means of the scheme and artifice to defraud that Defendant, without authorization, (1) removed a co-signatory to the Companies' bank accounts, (2) opened new bank accounts in the Companies' names at the same financial institutions as the Companies' existing accounts, (3) issued checks, closed the Companies' existing accounts, and transferred the closing balances into the new accounts she opened and controlled, and (4) used such misappropriated funds to make unauthorized purchases, payments, and transfers to benefit herself and others in a way that did not remotely benefit the Companies, and took significant efforts to conceal the source, location, ownership, and control of the misappropriated funds.

8.   To execute her scheme and artifice to defraud, Defendant knowingly made and caused to be made material false and fraudulent pretenses, representations, promises, and omissions, including among others: knowingly failing to disclose to the Companies her on-going

3

embezzlement of their funds; when submitting signed addenda to Wells Fargo to remove her co-signatory from the Companies' existing bank accounts for Nautical and Vitality, knowingly representing that (i) she was the "Managing Member" of Nautical and Vitality, and (ii) the account holder took all action under its organization documents, such as passage of a resolution, required to make the requested modification and to authorize her to execute and deliver the addenda; when submitting signed applications to Wells Fargo and Citibank to open new bank accounts in the Companies' names, knowingly representing that (i) she was the "Managing Member," "Sole Owner," "Owner with Control of the Entity," or had "100" percent ownership of the specified entity, and (ii) the specified entity had approved the application and authorized her to open the new bank account on behalf of the entity; knowingly failing to disclose to Wells Fargo and Citibank that she was not authorized to open new bank accounts in the Companies' names; knowingly failing to disclose to Wells Fargo that she was not authorized to issue checks to her personal attorney and business totaling $125,000 from the Companies' existing accounts at Wells Fargo; knowingly failing to disclose to Wells Fargo and Citibank that she was not authorized to close the Companies' existing accounts and transfer the closing balances to the new accounts she opened and controlled in the Companies' names at those financial institutions; and knowingly failing to disclose to Wells Fargo, Citibank, Bank of America, and other financial institutions that the interstate wires she initiated were unauthorized.

9. On or about the dates set forth below, within the Southern District of California and elsewhere, Defendant PING GAO, for the purpose of executing the above-described scheme and artifice to defraud

4

and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises, and omissions, knowingly caused the following writings, signs, signals, pictures, and sounds to be transmitted by means of wire communication in interstate commerce:

| Count | Date | Wire |
|---|---|---|
| 1 | 5/11/2022 | Check for $120,000.00 from Wells Fargo (x7596) to Honshan Trading |
| 2 | 5/16/2022 | Check for $9,643,071.65 from Wells Fargo (x7596) to Wells Fargo (x7149) |

All in violation of 18 U.S.C. § 1343.

### Counts 3-5 – Concealment Money Laundering

(18 U.S.C. § 1956(a)(1)(B)(i))

10. On or about the dates set forth below, within the Southern District of California and elsewhere, Defendant PING GAO, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, namely bank fraud in violation of 18 U.S.C. § 1344 and wire fraud in violation of 18 U.S.C. § 1343, further described in paragraphs one through nine above, which are realleged herein, knowingly and willingly conducted and caused to be conducted the following financial transactions designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such unlawful activity:

| Count | Date | Transaction |
|---|---|---|
| 3 | 5/23/2022 | Wire transfer for $3,000,000.00 from Wells Fargo (x7149) to Honshan Trading |
| 4 | 6/1/2022 | Checkcard payment for $9,558.50 from Honshan Trading to Ethan Allen San Diego |
| 5 | 6/17/2022 | Check for $161,392.24 from Honshan Trading to Porsche San Diego |

All in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

### Count 6 – Money Laundering

(18 U.S.C. § 1957)

11. On or about the date set forth below, within the Southern District of California and elsewhere, Defendant PING GAO, knowing that the following monetary transaction involved criminally derived property, and the property had a value greater than $10,000 and was, in fact, derived from bank fraud in violation of 18 U.S.C. § 1344 and wire fraud in violation of 18 U.S.C. § 1343, further described in paragraphs one through nine above, which are realleged herein, knowingly and willingly engaged and caused to be engaged in the following monetary transaction, which occurred in the United States:

| Count | Date | Transaction |
|---|---|---|
| 6 | 5/20/2022 | Wire transfer for $2,900,000.00 from Wells Fargo (x7149) to Eaton Escrow |

All in violation of 18 U.S.C. § 1957.

### Counts 7-8 – Aggravated Identity Theft

(18 U.S.C. § 1028A and 18 U.S.C. § 2)

12. On or about the dates set forth below, within the Southern District of California and elsewhere, during and in relation to felony violations of 18 U.S.C. § 1344 (bank fraud) and 18 U.S.C. § 1343 (wire fraud), further described in paragraphs one through nine above, which are alleged herein, Defendant PING GAO knowingly transferred, possessed, and used, without legal authority, the following means of identification of the individual specified below, and aided and abetted its commission, knowing that the means of identification belonged to another actual person:

| Count | Date | Actual Person | Document(s) | Means of Identification |
|---|---|---|---|---|
| 7 | 6/8/2022 | W.L. | Letter from H.C.H. on Behalf of W.L. | Name Signature |
| 8 | 6/8/2022 | W.L. | Notarial Certificate and Engagement Letter | Name Date of Birth ID Card Number Signature |

All in violation of 18 U.S.C. § 1028A and 18 U.S.C. § 2.

**Criminal Forfeiture Allegations**

13. The allegations contained in paragraphs one through eleven of this Complaint are re-alleged and incorporated by reference for the purpose of alleging forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), and 28 U.S.C. § 2461(c).

14. Upon conviction of one or more of the offenses alleged in Counts one and two, Defendant PING GAO shall forfeit to the United States all of their rights, title, and interest in any property, real and personal, which constitutes or is derived from proceeds traceable to such offenses. The property to be forfeited includes, but is not limited to, the following:

   a. A 2022 Porsche Panamera, VIN WP0Aj2A72NL100972, registered to Ping Gao or Honshan Trading, Inc.; and

   b. A 2022 Mercedes-Benz Sprinter 250, VIN W1Y4ECVY6NT102472, registered to Ha.W.

15. Upon conviction of one or more of the offenses alleged in Counts three through six, Defendant PING GAO shall forfeit to the United States all of their rights, title, and interest in any property, real and personal, involved in the offenses and any property traceable to such property.

16. Upon conviction of one or more of the offenses alleged in Counts seven and eight, Defendant PING GAO shall forfeit to the United States all of their rights, title, and interest in any property, real and personal, which constitutes or is derived from proceeds traceable to such offenses.

17. If, as a result of any act or omission of Defendant PING GAO, the property described above, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of this court; has been substantially diminished in value; or has been commingled with other property that cannot be divided without difficulty; it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), 18 U.S.C. § 982(b), and Title 28, U.S.C. § 2461(c), to forfeit substitute property, up to the value of the property described above. All pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), 982(b), and 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c).

The complainant states that this Complaint is based on the attached statement of facts, which is incorporated herein by reference.

*Leah Chambers*
Special Agent Leah Chambers
Federal Bureau of Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, on October 26, 2023.

Honorable Mitchell D. Dembin
United States Magistrate Judge

8

**Probable Cause Statement**

I, Leah Chambers, state as follows:

Based on my review of documents and evidence relating to this case, including bank records, text messages, company formation, registration, and employment documents, summary charts of financial transactions, declarations, and a certified copy of the statement of decision issued in *Nautical Hero Group, LLC et al. v. Ping Gao, et al.*, Case No. 37-2022-00019266-CU-FR-CTL and filed on October 3, 2023, I state that the following is true and accurate to the best of my knowledge:

**A.   The Companies**

1.   Beginning in August 2020, W.L., a resident and national of the People's Republic of China, began to invest and conduct business in the American aviation industry.  W.L. sought to purchase assets, improve upon their concepts, and bring a commercially viable aircraft to market in the United States.

2.   W.L. learned about this business opportunity from a friend, C.Z.  W.L. had known C.Z. for more than a decade.  C.Z. lived in San Diego, California.

3.   In or around 2020, C.Z. informed W.L. that there was an opportunity to purchase certain assets from Kestrel Aircraft out of bankruptcy in the United States (the "Kestrel Assets").

4.   W.L. decided to invest in the Kestrel Assets using United States business entities.

5.   C.Z. served as the point of contact in the United States for W.L.'s proposed acquisition of the Kestrel Assets.  C.Z. served as the point of contact because he lived in the United States and had the ability to oversee activities while W.L. was unable to travel due to

COVID-19 travel restrictions. W.L. also engaged counsel to represent him in the bankruptcy proceedings.

6. W.L. was ultimately successful in buying the Kestrel Assets out of the bankruptcy proceedings.

7. C.Z. and his colleague, Hu.W., assisted W.L. in forming three companies in the United States to hold the Kestrel Assets. The companies were Nautical Hero Group, LLC ("Nautical"), Vitality International Management, LLC ("Vitality"), and Axiom United Holdings, LLC ("Axiom") (collectively, the "Companies"). The Companies were formed on August 13, 2020, December 17, 2020, and January 7, 2021, respectively, with W.L. listed in each entity's operating agreement as the sole member. The Companies were structured so that separate entities would manage personnel and hold assets. Specifically, Nautical was formed as the group holding company; Axiom was formed to pursue business opportunities in the United States, with a focus on the hydrogen-powered aircraft space; and Vitality was formed to provide management services to Nautical and Axiom.

**B.    W.L. Funded the Companies**

8. W.L. funded the Companies using his own money. C.Z. coordinated the transfer of W.L.'s funds to the Companies on W.L.'s behalf. As of early May 2022, the Companies maintained a total of over 23 million dollars in United States bank accounts at Wells Fargo and Citibank.

**C.    The Companies Hired a Series of Bank Account Representatives**

9. In operating the Companies, W.L. wanted a clear separation between the Companies' managers, such as C.Z. and Hu.W., and their operations personnel. In China, it was common to have a relatively

10

low-level administrative employee serve as an accounts payable clerk with signatory authority over a company's bank account. This practice allowed a company's management to instruct the clerk to conduct approved transactions.

10.  Given their start-up nature, the Companies had few employees at inception and hired S.C. in late 2020.  S.C. had worked as a nanny to C.Z.'s infant children since May 2020.  The Companies hired S.C. to serve as a bank account representative with signatory authority on their bank accounts.  S.C. was not authorized to make transfers or payments on the accounts unless directed and approved by the Companies.  As a security measure, C.Z. collected from S.C. (as well as later signers to the Companies' bank accounts) the debit cards associated with these accounts and the username and password to the bank's online system to access these accounts.  C.Z. provided this information to W.L.  To compensate S.C. for her duties (in addition to those as a nanny), C.Z. increased S.C.'s pay from $3,600 a month to $5,000 a month.

11.  Later in 2020, S.C. advised C.Z. that she could no longer serve as the Companies' bank representative but recommended that the Companies hire her daughter, Defendant PING GAO, to serve that role.

12.  The Companies' corporate representatives, C.Z. and Hu.W., agreed to hire Defendant on a temporary basis to serve as a signer on the Companies' bank accounts.  The Companies paid Defendant $500 a month for her temporary role.

13.  Defendant served in this temporary role until early 2021. Defendant took instructions from C.Z. and did not have any ownership of or actual authority over the Companies' assets.

//

11

14. Later, in 2021, as operations began in earnest, the Companies hired several employees to serve as their banking representatives and replace Defendant as the signer on their bank accounts. Each of these employees performed banking transactions as instructed by W.L. and his corporate representatives, C.Z. and Hu.W. Like Defendant, none of these employees had any ownership of or actual authority over the Companies' assets.

**D.  Nautical Rehired Defendant as a Banking Relationship Specialist**

15. In late 2021, the Companies' banking representative informed the Companies that she was moving out of state and the Companies needed a new signer on their bank accounts. S.C., Defendant's mother, learned of the opportunity and informed C.Z. that Defendant was available to rehire.

16. In mid-January 2022, Defendant signed an employment agreement and Nautical hired her as a "Bank Relationship Specialist." This was a part time job and Defendant's salary was $2,000 a month. Her duties and responsibilities included assisting the Companies with banking related matters, serving as the signer on the Companies' bank accounts, and "mak[ing] fund transfers or payments strictly as directed by the Companies AND only as permitted and approved by the Companies."

**E.  Nautical Hired Another Employee to Serve as a Second Signatory**

17. In February 2022, Nautical hired an additional employee to serve as a second signatory on several of the Companies' bank accounts alongside Defendant. Nautical did this as a security measure. This employee's role included checking the balance of the Companies' bank accounts, reporting the balances to C.Z., and providing a $2,000 check to Defendant at the beginning of each month.

12

**F.    Defendant's Request for a Raise was Denied**

18.    In April 2022, Defendant asked Hu.W. for a salary increase from $2,000 a month to $8,000 a month.  The request was denied.

**G.    Defendant Took Control of the Companies' Bank Accounts and Funds Without Authorization**

19.    As of early May 2022, four of the Companies' bank accounts contained a total of over 23 million dollars, as outlined below:

| Owner | Account No. | Bank | Balance |
|---|---|---|---|
| Axiom | X1835 | Citibank | $12,110,450.33 |
| Vitality | X5194 | Citibank | $1,500,000.00 |
| Vitality | X7596 | Wells Fargo | $9,764,865.59 |
| Nautical | X3540 | Wells Fargo | $113,516.93 |

20.    On May 9, 2022, Defendant submitted signed addenda to Wells Fargo to remove her co-signatory to the Vitality (x7596) and Nautical (x3540) bank accounts at Wells Fargo.  Defendant was already the sole signatory to the Axiom (x1835) and Vitality (x5194) bank accounts at Citibank.  In submitting the signed addenda to Wells Fargo, Defendant falsely stated that she was the "Managing Member" at Nautical and Vitality.  She also falsely certified that the account holder had taken all actions under its organizational documents, such as passage of a resolution, required to make the modifications and to authorize her to remove the co-signatory from the accounts.  When the co-signatory learned that she had been removed as a signer, she called Defendant to discuss what happened but Defendant did not answer or return her call.

21.    A week later, on May 16, 2022, Defendant opened four new bank accounts at Wells Fargo and Citibank in the Companies' names listing herself as the sole owner and signatory on the accounts.  The accounts included one for Axiom (x7412), two for Vitality (x7149 and x7404), and

13

one for Nautical (x7131). In submitting the signed applications, Defendant falsely represented that she was the "Managing Member," "Sole Owner," "Owner with Control of the Entity," or had "100" percent ownership of the specified entity, and falsely certified that the specified entity had approved the application and authorized her to open the new bank account on behalf of the entity. Other than Defendant, no one at the Companies had access to or control over these new bank accounts.

22. Days later, Defendant issued two checks from the Companies' existing bank accounts at Wells Fargo. The first check was for $5,000 and made payable to Defendant's attorney. The second check was for $120,000 and made payable to Honshan Trading, Inc. ("Honshan"). Defendant formed Honshan in 2017 and was its sole shareholder. Further, prior to receiving the $120,000 check, the opening balance of Honshan's bank account was less than $2,800. Neither of these checks was approved by W.L. or the Companies, and the funds did not belong to Defendant.

23. Soon after issuing these checks, Defendant closed the Companies' existing bank accounts at Wells Fargo and Citibank and transferred the closing balances into the new accounts she opened at the same financial institutions, as outlined below:

//
//
//
//
//
//
//

| The Companies' Then Existing Bank Accounts | | Defendant's New Bank Accounts as Sole Owner |
|---|---|---|
| Company   Axiom<br>Bank No.  Citibank x1835<br>Balance    $12,110,450.33 | 5/20/22 → | Company   Axiom<br>Bank No.  Citibank x7412<br>Balance    $12,110,114.33 |
| Company   Vitality<br>Bank No.  Citibank x5194<br>Balance    $1,500,000.00 | 5/18/22 → | Company   Vitality<br>Bank No.  Citibank x7404<br>Balance    $1,500,000.00 |
| Company   Vitality<br>Bank No.  Wells Fargo x7596<br>Balance    $9,764.865.59 | 5/16/22 → | Company   Vitality<br>Bank No.  Wells Fargo x7149<br>Balance    $9,643,071.65 |
|  | 5/11/22 → | Honshan Trading, Inc.<br>Check Amount: $120,000.00 |
| Company   Nautical<br>Bank No.  Wells Fargo x3540<br>Balance    $113,516.93 | 5/18/22 → | Company   Nautical<br>Bank No.  Wells Fargo x7131<br>Balance    $107,437.44 |
|  | 5/9/22 → | Law Office of C.P.<br>Check Amount: $5,000.00 |

24.     Neither W.L. nor the Companies directed, permitted, or approved Defendant (1) removing the co-signatory to the Companies' existing bank accounts at Wells Fargo, (2) opening four new bank accounts in the Companies' names at Wells Fargo and Citibank with Defendant having access to, control over, and ownership of such accounts, (3) issuing two checks totaling $125,000 from the Companies' existing accounts at Wells Fargo made payable to her attorney and business, and (4) closing the Companies' existing accounts at Wells Fargo and Citibank and transferring the closing balances into the new accounts she opened at the same financial institutions.

25.     Further, on May 18, 2022, Defendant filed a Statement of Information with the California Secretary of State in which she falsely identified herself as the sole member of Nautical and fraudulently appointed herself as Nautical's Agent for Service of Process, and changed the registered business address for Nautical to a home address near Sorrento Hills, California.

**H. Defendant Began to Rapidly Spend, Transfer, and Conceal the Companies' Funds Without Permission or Approval**

26. After transferring the Companies' funds to the new bank accounts controlled by Defendant, Defendant began to rapidly spend, transfer, and conceal the Companies' funds without permission or approval from W.L. or the Companies. For example, Defendant moved over $8,470,000 of the Companies' funds out of one of the new Vitality bank accounts in just five days, as detailed below:

   a. On May 18, 2022 and May 20, 2022, Defendant issued two checks totaling $800,000 to RTE International, a company owned by Defendant's former husband;

   b. On May 19, 2022, Defendant issued two checks totaling $10,000 to Defendant's attorney;

   c. On May 20, 2022, Defendant wired $2,900,000 to an escrow company to purchase a luxury home in San Diego, California;

   d. On May 23, 2022, Defendant wired $1,500,000 to a criminal defense law firm in Los Angeles, California; and

   e. On May 23, 2022, Defendant wired $3,000,000 and issued a $260,000 check to Honshan, a company she created in 2017 and owned.

**I. The Companies and W.L. Filed a Lawsuit and Obtained a Temporary Restraining Order against Defendant**

27. On May 23, 2022, the Companies and W.L. filed a lawsuit against Defendant in San Diego Superior Court.

28. On May 24, 2022, the Superior Court granted a TRO against Defendant, which was converted into an Injunction on June 9, 2022. The TRO and Injunction restrained Defendant "and all persons acting in concert or participation with her" from "transferring, converting,

16

gifting, dissipating, spending, withdrawing, granting a lien or security interest or other interest in, or otherwise disposing of any funds in any amount of any account out of any financial institution, which funds are traceable, directly or indirectly, to the [Companies' original bank accounts with Wells Fargo and Citibank]." The TRO and Injunction also restrained Defendant from engaging in any act on or behalf of the Companies or any one of the Companies.

**J.   Defendant Stated Under Oath that W.L. was an Imposter and Submitted Documents Containing a Forged Signature of W.L.**

29. At the hearings on the TRO, Injunction, and throughout the lawsuit, Defendant disputed liability. She defended her actions in closing the Companies' bank accounts, moving more than 23 million of the Companies' funds to new accounts that she opened and controlled, and spending Vitality's funds, by claiming that W.L. was an imposter. She also claimed that she was in contact with, and acting pursuant to the instruction of, the real W.L.

30. In or around late May 2022 to early June 2022, Defendant caused the following two documents to be transmitted to her attorneys, who then filed them with the Superior Court on June 8, 2022 to bolster her effort to have the lawsuit dismissed and oppose an Injunction:

    a. A letter purportedly signed by W.L. and an attorney in China named H.C.H. The letter stated that Defendant was assisting W.L. "in obtaining control of [W.L.'s] money," that "[W.L.]'s money has been stolen by [C.Z.] and [Hu.W.]," and that "[n]o one other than Ping Gao is authorized to act on behalf of Nautical Hero Group, LLC, Axiom United Holdings LLC or Vitality International Management LLC."

//

17

   b. An engagement agreement from the law firm representing Defendant purportedly signed by W.L.  Attached to the engagement agreement was a Notarial Certificate, Number 3385, from the Fuzhou Minjiang Notary Public Office in Fujian Province, China, purportedly attesting to W.L.'s signature to the engagement agreement.

 31. Both of the documents reflect the identities of real people and contain false and fraudulent information.  For example, W.L. came from China and testified in court through a video-recorded deposition that he did not know an attorney named H.C.H. and did not engage such an attorney in China or elsewhere to represent him.  W.L. also testified that he did not place his signature on the documents and that they were forgeries.  Further, the Fuzhou Minjiang Notary Public Office in Fujian Province, China issued a certified letter verifying that the Notarial Certificate, Number 3385, was not issued by its office.  And according to expert witness testimony given in court, the Chinese ID card number provided for W.L. on the Notarial Certificate, Number 3385, indicated that it would be for a female, not a male, based on the 17th digit in the sequence, and thus could not belong to W.L.

 32. Defendant also supported her defense by claiming that while the real W.L. owned Vitality and Nautical, she actually owned Axiom and Axiom had nothing to do with W.L.  Defendant later provided differing testimony that she owned some or all of the funds in the Companies' bank accounts, and the funds in Axiom's account came from her investments in China.  Defendant further supported her defense by suggesting that the bank records for the new bank accounts she created for the Companies listed her as the owner or member of the entities.

//

**K.  Defendant Repeatedly Violated the TRO and Injunction**

33. While Defendant's transfer of $3,380,000 to her company, Honshan, pre-dated the entry of the TRO and Injunction, both the TRO and Injunction enjoined Defendant from further transferring the funds. Despite the court orders, Defendant continued to engage in financial transactions, both immediately after their entry and throughout the pendency of the lawsuit, to conceal and disguise the nature, location, source, ownership, and control of the proceeds. For example:

   a. Since May 23, 2022, Defendant has transferred more than $1,000,000 to herself and spent tens of thousands of dollars or more on luxuries and at high-end fashion stores;

   b. On June 17, 2022, Defendant purchased a new 2022 Porsche Panamera for over $160,000; and

   c. On June 22, 2022, Defendant wired $1,600,000 from Honshan to a bank account in Hong Kong, China.

34. The TRO and Injunction also enjoined Defendant from engaging in acts on behalf of the Companies. Despite the court orders, Defendant continued to act on behalf of the Companies to perpetuate the fraud, intimidate witnesses, and conceal and disguise the nature, location, source, ownership, and control of the proceeds. For example:

   a. On June 21, 2022, Defendant opened a bank account at Bank of America in the name of Aixom Holding Management, Inc. ("Aixom") as sole owner and signatory and subsequently transferred $600,000 of stolen funds from Honshan to Aixom;

   b. On or about August 9, 2022, Defendant signed and served an eviction notice at a residential property that Vitality purchased in December 2021 and which C.Z. used as a residence; and

19

      c.   On or about April 21, 2023, Defendant transferred the $2,845,000 luxury home (which she caused Vitality to buy in May 2022) from Vitality to herself, and later encumbered the property with a $400,000 mortgage, despite being explicitly ordered by the Superior Court not to encumber the property in any fashion.

    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED: __10/26/2023_____      *Leah Chambers*_____
                                              Special Agent Leah Chambers
                                              Federal Bureau of Investigations